RECEIVED
USDC, WESTERN DISTRICT OF LA.
TONY R. MOORE, CLERK
DATE _____
BY _____

## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## MONROE DIVISION

| | |
|---|---|
| LINDA WILLIAMS, ET AL. | CIVIL ACTION NO. 65-11329 |
| VERSUS | JUDGE ROBERT G. JAMES |
| GEORGE KIMBROUGH, ET AL, | MAG. JUDGE KAREN L. HAYES |

### RULING

This is a desegregation action originally brought in 1965 by parents of black students then attending school in Madison Parish.  On January 30, 1970, the Court issued a desegregation order, under which the Madison Parish School Board ("the School Board") has operated, with occasional amendments, over the past forty years.

Pending before the Court is a Motion for Declaration of Unitary Status [Doc. No. 17] filed by the School Board.  The School Board contends that it has complied with its duty to desegregate, eliminated the vestiges of past discrimination, and should be declared unitary in all areas of operation.  For the following reasons, the motion is GRANTED.  The Court finds that the School Board has achieved unitary status in all areas of operation, and the permanent injunction issued by the Court is DISSOLVED.

I.      FACTS

This lawsuit, filed August 20, 1965, as a class action on behalf of black students in Madison Parish, sought injunctive relief against the School Board's operation and administration of its public schools on a racially discriminatory basis.

On January 30, 1970, the Court, Judge Ben Dawkins presiding, issued its original

desegregation order.  In that order, Judge Dawkins found that the School Board had practiced *de jure* raced-based segregation and permanently enjoined the School Board from "discriminating on the basis of race or color in the operation of their parish school system."  Judge Dawkins further ordered the School Board to take a number of actions to eradicate all vestiges of the *de jure* system.

Since the issuance of the 1970 Order, this Court has supervised the School Board's desegregation efforts.  In 1970 the School Board oversaw eight schools[1] and served approximately 4,540 students, approximately 71-72% of whom were black.[2]  During the past many years, the Court approved the closure and consolidation of schools, so that, currently, the School Board operates two elementary schools, one junior high school, and one high school.  As of the date this Motion was filed, the School Board served almost 1,859 students, approximately 93% of whom are black and 6% are white.

On March 25, 2010, the School Board filed the pending Motion for Declaration of Unitary Status.  Although notice was provided to Plaintiffs' counsel at the most recent addresses available, none of the private Plaintiffs have filed an objection to a finding of unitary status.  No governmental entity has sought to intervene in this lawsuit, so the motion stands uncontested.

## II.    LAW AND ANALYSIS

When first presented with a school desegregation case, a district court is charged with determining whether or not a school board has maintained or facilitated a dual school system in

---

[1]In January 1970, Tallulah and Wright Elementary Schools served grades 1-6, Australia Island and Waverly served grades 1-8, Thomastown served grades 1-12, McCall Junior High served grades 7-9, Tallulah High School served grades 7-12, and McCall Senior High School served grades 10-12.

[2]The January 30, 1970 Order notes that, as of December 1969, 72.2% of students were black, and 27.8% of students were white.  Other record evidence suggests that 71% of students were black.

2

violation of the Equal Protection Clause of the United States Constitution.  U.S. CONST., Amend. XIV.  If the district court finds such a violation, then under *Brown v. Board of Educ. of Topeka, Shawnee County, Kan.*, 347 U.S. 483 (1954), and *Brown v. Board of Educ.*, 349 U.S. 294 (1955), the dual system must be dismantled, and the school board must "take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green v. County Sch. Bd. of New Kent Cty., Va.*, 391 U.S. 430, 437-38 (1968).

Neither a school board's nor a district court's duty ends with the initial desegregation order. Rather, there is a "continuing duty [for school officials] to eliminate the system-wide effects of earlier discrimination and to create a unitary school system untainted by the past." *Ross v. Houston Indep. School Dist.*, 699 F.2d 218, 225 (5th Cir. 1983) (citing *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971)).  Likewise, the district court "retain[s] jurisdiction until it is clear that state-imposed segregation has been completely removed." *Id.* (citing *Green*, 391 U.S. at 439; *Raney v. Bd. of Educ.*, 391 U.S. 443, 449 (1968)).

Ultimately, however, the goal of the district court is to return "schools to the control of local authorities at the earliest practicable date." *Freeman v. Pitts*, 503 U.S. 467, 490 (1992).  In discharging this duty, the district court considers the Supreme Court's "*Green* factors":  (1) faculty and staff assignments; (2) transportation; (3) extra-curricular activities; (4) facilities; and (5) student assignments.  *Green*, 391 U.S. at 435; *see also Bd. of Educ. of Okla. City Pub. Sch. v. Dowell*, 498 U.S. 237, 250 (1991).  The district court may find that a school board has reached partial unitary status on one or more factors.  *Freeman*, 503 U.S. at 489.  A school board "bears the burden of showing that any current imbalance [in these areas] is not traceable, in a proximate way, to the prior violation." *Id.* at 493.

3

"The District Court should address itself to whether the Board had complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable." *Dowell*, 498 at 249-50; *Freeman*, 503 U.S. at 491; *Green*, 391 U.S. at 439; *Ross*, 699 F.2d at 225. To meet its obligation, "[f]or at least three years, the school board must report to the district court." *Monteilh v. St. Landry Parish Sch. Bd.*, 848 F.2d 625, 629 (5th Cir. 1988). Further, "the district in question must have for several years operated as a unitary system." *Lemon v. Bossier Parish Sch. Bd.*, 444 F.2d 1400, 1401 (5th Cir.1971). Once the Court determines that the facts reveal no continued racial discrimination and the school board's good faith to maintain such non-discriminatory practices, it may declare the subject area unitary. *See Freeman*, 503 U.S. at 490-91; *see also Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307, 1314 (5th Cir. 1991) (We use the term "unitary" to refer to a school district that "has done all that it could to remedy the [prior] segregation caused by official action.") .

A.     **The *Green* Factors**

1.     **Faculty and Staff Assignments**

The 1970 Order included a provision requiring that the assignment of teachers and staff who work directly with children be in such a manner as to avoid having the "racial composition of a staff indicate that a school is intended for Negro students or white students." To assist in reaching that goal, the Court ordered that the ratio of black to white teachers and other staff who work directly with children be "substantially the same as each such ratio is to the teachers and other staff, respectively, in the entire school system."

The Fifth Circuit has further instructed:

In *Singleton v. Jackson Municipal Separate School District*, we announced several

requirements for hiring and assigning faculty and staff in schools under desegregation orders. *See* 419 F.2d 1211, 1217-18 (5th Cir.1969) (*en banc*), *rev'd in part sub. nom., Carter v. West Feliciana Parish Sch. Bd.*, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970). Only two of the Singleton requirements are relevant here. First, a school must show that faculty and staff who work directly with children are assigned in such a manner that the racial composition of the faculty and staff would not indicate that the school is intended for either African-American or white students. *Id.* Second, "discrimination on the basis of race, color or national origin in the hiring, assignment, promotion, pay, demotion or dismissal of faculty members and administrative staff" is prohibited. *Fort Bend Ind. Sch. Dist. v. Stafford*, 651 F.2d 1133, 1138 (5th Cir. 1981) (discussing *Singleton*, 419 F.2d at 1217-18). We have made clear that these requirements do not establish an arbitrary racial quota. *See id.* at 1139.

*Anderson v. School Bd. of Madison Cty, Ms.*, 517 F.3d 292, 303 (5th Cir. 2008).

The School Board has overseen the administration and enforcement of these provisions. It has adopted and implemented policies and procedures consistent with these directives. The result of such non-discriminatory policies is demonstrated in the diversity of faculty at each school in the District. The School Board oversees the application of objective hiring criteria and a non-discriminatory process for selection of faculty and staff members.

Additionally, the School Board has demonstrated non-discriminatory hiring and assignment practices in the area of staff assignments. Each school has black administrators, the central office staff is predominately black, and the District has been led by a black superintendent for many years.

The Court finds that the School Board has effectively eradicated any vestige of past discrimination with regard to faculty and staff assignments and has consistently maintained and implemented such non-discriminatory policies and practices for many more than the requisite three (3) years necessary to demonstrate it has attained unitary status in that area of operation. Therefore, the School Board is declared unitary in the area of faculty and staff assignments.

## 2.    Transportation

With regard to transportation, the 1970 Order mandated, as follows:

> No student shall be segregated or discriminated against on account of
> race or color in any service . . . . (including transportation . . .) . . . .
> Bus routes and the assignment of students to buses will be designed
> to [e]nsure the transportation of all eligible pupils on a non-
> segregated and otherwise non-discriminatory basis.

Valid objections to a transportation plan may rise "when the time or distance of travel is so great as
to either risk the health of the children or significantly impinge on the educational process." *Swann,*
402 U.S. at 30-31.  The Court must weigh the soundness of any transportation plan in light of these
concerns as well as general desegregation concerns.

The School Board has continuously and purposefully implemented  unitary transportation
policies for more than the past three years.  Under those policies, all public and private school
students of Madison Parish who request transportation are provided free school bus transportation
to and from school, regardless of how far or close they live to the school which they attend.  The
students are both assigned and transported according to a geographically feasible route schedule that
affords the most integration possible given the geographical and time limitations.   Routes are
adjusted when necessary to accommodate population changes, without using race as a factor in such
adjustments.  Additionally, the School Board is in full compliance with all laws of the State of
Louisiana regarding the provision of transportation to all students who reside more than one mile
from their assigned school and desire transportation to and from school as well as all other statutes
applicable to bus transportation services.[3]

The Court finds that the School Board has operated and continues to operate its system-wide

---

[3]*See* LA.REV.STAT. §§ 17:158 through 17:164.2.

transportation program in a unitary manner, with no vestige of past discrimination remaining in that area of operation. It has adhered to its non-discriminatory policies and practices for many more than the requisite three years necessary to demonstrate it has attained unitary status in that area of operation. Therefore, the School Board is unitary in the area of transportation.

### 3.   Extra-Curricular Activities

The 1970 Order addresses extra-curricular activities, as follows:

> No student shall be segregated or discriminated against on account of race or color in any . . . activity, or program (including . . . athletics, or other extra-curricular activity) that may be conducted or sponsored by the school in which he is enrolled.

A school district's extra-curricular activities will be deemed unitary if equal access for all student is provided. *Quarles v. Oxford Mun. Sep. Sch. Dist.*, 868 F.2d 750, 757 (5th Cir. 1989)(citing *Bazemore v. Friday*, 478 U.S. 385 (1986)).

The School Board has endeavored to and has succeeded in eliminating all vestiges of past discrimination from its extra-curricular programs throughout the District. In accordance with policy, students participate in the various offered activities on a completely voluntary basis. The School Board has not created any barriers which would deter or prevent a student from participating in an activity of his or her choice.

The Court finds that the School Board is unitary in the area of extra-curricular activities.

### 4.   Facilities

***Physical facilities should be deemed unitary when the school board has ensured, to the*** extent practicable, that its facilities are not amenable to racial identification simply on the basis of their physical condition. *Swann,*, 402 U.S. at 18. The 1970 Order contained general remedial directives designed to address this concern.

7

On or about January 5, 2010, the School Board opened the newly constructed Madison Parish Middle School and Madison Parish High School.  The elementary school facilities  (Tallulah Elementary and Wright Elementary) are not new, but are well-maintained, grade-appropriate facilities.  Thus, the Court finds that the School Board has provided facilities that are not racially identifiable and is unitary in this area.

### 5.    Student Assignments

The 1970 Order directed that the assignment of "students shall be made, as nearly as practicable, in accordance with the schedule of projected zoning assignments" that it adopted at that time. Subsequently, the School Board consolidated schools to form one Parish-wide high school and one Parish-wide middle school and reconfigured the elementary schools into two schools.  Thus, all Madison Parish students attend the same middle school and high school, and the attendance statistics reflect the parish-wide student demographics.

With regard to elementary schools, the School Board operates Wright and Tallulah Elementary Schools. Tallulah Elementary is comprised of approximately 13.1% white students and 83.7% black students.  Wright Elementary has no white students and is comprised of 99.6% black students. Without explanation, the demographics at Tallulah and Wright Elementary Schools might give the Court cause for further review.  However, as the School Board points out, assignment of white students from Tallulah to Wright is highly impracticable because of the geographical distance from Tallulah Elementary, and taking white students away from the 13% white enrollment at Tallulah Elementary would result in populations that are not significant for desegregation purposes

8

at either school.[4]

While the 1970 Order also includes certain provisions regarding student transfers, the majority-to-minority policy is no longer applicable given the present school structure.  The School Board has, in good faith, adopted a non-discriminatory transfer policy which is implemented to afford transfers upon request if "determined to be in the best interests of the student and the school system," but such inter-district transfers have been extremely rare and do not adversely affect the desegregation of schools in Madison Parish.

The School Board has consistently maintained and implemented non-discriminatory policies and practices for many more than the requisite three years.  The Court finds that the School Board has effectively eradicated any vestige of past discrimination and is unitary in the area of student assignments.

### B.    Good Faith

The Court's findings above with regard to the *Green* factors constitute outward signs of the School Board's commitment to its students, employees, the public, and to this Court that it has, in good faith, erased all traces of prior discrimination.  Having fully reviewed the submission of the School Board, the Court also finds that it has demonstrated its good faith commitment to the entirety of the desegregation plan, so that the students, parents, and public have assurance that further injuries or stigma will not occur.

---

[4]Notably, no court has found that a school is racially identifiable merely because it deviates by such a small percentage from the parish-wide student demographics.  As comprised, both Tallulah and Wright Elementary Schools are within the plus or minus 20% range that has been used by the Fifth Circuit in finding that a school is not racially identifiable.  *See United States v. Texas Educ. Agency*, 679 F.2d 1104, 1114 (5th Cir. 1982).  Thus, the Court need not take corrective measures.

III.   **CONCLUSION**

For the foregoing reasons, the School Board's motion is GRANTED.  The Court finds that the School Board has demonstrated that it has achieved unitary status in the areas of student assignment, physical facilities, transportation, extra-curricular activities, and  teacher and staff assignment; has exhibited good faith in achievement and maintenance of such non-discriminatory programs; and is prepared, willing, and ready to move forward in a constitutionally consistent manner without direct judicial supervision. The permanent injunction previously entered is DISSOLVED, and the Court will end its direct supervision of the School Board.

MONROE, LOUISIANA, this ___3___ day of ___May_____, 2010.


**ROBERT G. JAMES**
**UNITED STATES DISTRICT JUDGE**